**Cecil COOK and Thomas Cook as Executors of the Estate of Grace Hansen, Deceased, Plaintiffs and Appellees,**

v.

**Alfred HANSEN, Mary Hansen, Douglas Hansen, Dwight Hansen and Hansen Ranch, Defendants and Appellants.**

Civ. No. 920087.

Supreme Court of North Dakota.

April 27, 1993.

Marshall T. Bergerud (argued), Killdeer, for plaintiffs and appellees.

Terence J. Paulson (argued), Paulson and Merrick, Jamestown, for defendants and appellants.

RALPH J. ERICKSTAD, Surrogate Judge.[1]

Alfred Hansen, his wife, Mary Hansen, his sons, Doug Hansen and Dwight Hansen, and the Hansen Ranch (the Hansens) appeal from a judgment entered against them by the District Court for Dunn County. We reverse all but that part of the judgment to which the parties stipulated, and remand for further proceedings consistent with this opinion.

Several years ago, Alfred Hansen and his two brothers operated a cattle business together. One of those brothers, Helmer, was married to Grace Hansen. Subsequent to Helmer's death in 1969, Grace allegedly reached an oral agreement with Alfred and the rest of the Hansens regarding her husband's cattle and land which she inherited. According to the Hansens, Grace allowed them to use over 2,000 acres of her land (mostly pasture land) in exchange for caring for her cattle. This lease arrangement continued without incident until March of 1988, when Grace died. Within four months of Grace's death, the Hansens sold 15 cows (along with spring calves and yearlings), and forwarded the

---

1. Surrogate Judge Ralph J. Erickstad was Chief Justice at the time this case was heard, and served as surrogate judge for this case pursuant to Section 27–17–03, N.D.C.C.

net proceeds of that sale to the executors of Grace's Estate, Cecil Cook and Thomas Cook (the Cooks). Then, fifteen months following Grace's death, the Hansens attempted to sell two cows at a public livestock auction. However, the cows carried two brands, one being the brand of Grace Hansen's stock, and the other being the brand of the Hansens' stock. The Hansen brand appeared to be the newer brand. Following an investigation and hearing by the North Dakota Stockmen's Association Brand Board, it was ordered that the net proceeds from the sale of the two cows be paid to Grace's Estate.[2] Following this incident, the Cooks contend that they learned of several other cows on the Hansen Ranch carrying double brands. They reached the conclusion that the Hansens had not relinquished all of Grace's property to the Estate.

█ The Cooks, as executors of Grace Hansen's Estate, brought suit against the Hansens alleging two causes of action. The first cause of action involved an estate tax dispute as to each heir's apportioned share of estate taxes, and was settled before trial. The second cause of action involved a claim by the Cooks regarding ownership of some cattle on the Hansen Ranch. The relevant part of the complaint reads:

"That plaintiffs hereby *claim ownership* of the remaining fifteen (15) head of re-branded cows together with their 1990 calf crop. Further, defendants have *converted* to their own use the 1988 calf crop from the fifteen (15) head of cows and the 1989 calf crop from the remaining thirteen (13) head of cows, all of which were *property of the plaintiffs.*

\*　　\*　　\*　　\*　　\*　　\*

"WHEREFORE, Plaintiffs pray judgment as follows:

\*　　\*　　\*　　\*　　\*　　\*

"5) Against Hansen Ranch for the delivery of those range cows bearing the Grace Hansen brand together with the 1990 calf crop and for damages in the amount of the value of the 1988 and 1989 calf crops from said cows or in the alternative, for the value of said livestock *at the time of conversion* thereof by the defendant Hansen Ranch. [Emphasis added.]"

In the answer to the complaint, the Hansens counterclaimed against the Cooks for recovery of the proceeds from the earlier sale of the two double-branded cows, and asserted that the remaining double-branded cows were owned by them. The Hansens also demanded a trial by a jury.

**2.** The Brand Board reached its determination by utilizing two statutes applicable to the situation. The first provides:

*"Effect of registered brand or mark—Bill of sale to be given and kept.* A legally registered brand on livestock is prima facie evidence that the animal bearing the same is the property of the owner of such brand, unless covered by a bill of sale as provided by section 36–09–20."

Section 36–09–19, N.D.C.C. The second statute states:

*"Bill of sale to be given and kept—Copy with shipment—Effect—Penalty.* No person may sell cattle, horses, mules, or any other livestock carrying a registered brand unless:

"1. The seller is the owner of the registered brand and delivers a bill of sale for the cattle, horses, mules, or other livestock to the purchaser; or

"2. The seller delivers to the purchaser a bill of sale executed by the owner of the registered brand and endorsed by the seller evidencing the later transaction.

"The bill of sale must contain the date, signature, and residence of the seller and name and address of the buyer, and showing the total number of animals sold, describing each animal sold as to sex and kind, and describing the registered brands. The bill of sale must be kept by the buyer for two years and as long thereafter as he owns any of the animals described therein. A copy of the bill of sale must be given to each hauler of such livestock, other than railroads, and must go with the shipment of such stock while in transit. Such bill or copy must be shown by the possessor on demand to any peace officer or brand inspector. Such bill of sale is prima facie evidence of the sale of the livestock therein described; provided, that no such bill of sale is required relative to sales of livestock covered by a legal livestock brand inspection. Any violation of this section is an infraction."

Section 36–09–20, N.D.C.C. Apparently, because the Hansens' brand was the newer brand, and no bill of sale was received by the Hansens from Grace Hansen or her Estate, the Brand Board determined ownership of the two cows to belong to the Estate of Grace Hansen.

The case was set for a jury trial in the District Court for Dunn County. However, at the pretrial conference, approximately two weeks before trial, the court determined that the Hansens were not entitled to a jury trial. Even though the parties stated at the conference that they were settling the estate tax issue, and even though the apportioned share of the estate taxes was an unrelated issue, the court thought that the ownership of the cattle was too bound up in the estate tax issue to warrant a jury trial. The court pondered: "But are [the Hansens] really entitled to [a jury trial] when talking about estate tax and the legal obligation to pay or reimburse the state and ownership? When we're talking about contracts of ownership and brands, are we really talking equitable matters and questions of law, the questions of fact being only corollary and incidental to the questions of law and equity involved?" The court also said: "Boy! I don't see how you're possibly entitled to a jury. Those [branding questions] are questions of law and questions of equity, and the questions of fact involved are only corollary or incidental, aren't they? I mean I certainly agree there are questions of fact here—serious—that need to be answered." The court decided that the Hansens were not entitled to a jury trial because "the ownership of the cows is so closely related to the amount of the tax and probate of the estate itself and probably should have been heard in probate court."

The court allowed the parties the opportunity to brief the jury trial issue, and held a telephone conference 11 days later. In the telephone conference, the court adhered to its prior decision of denying a jury trial, although it expressed some doubt as to the correctness of its decision. "[Q]uite frankly, I have some doubt about my ruling, at least to the extent that it involves the ownership of the cows and in what contract there was, if any." The court then attempted to characterize the type of action the Cooks brought, and was still very concerned about the estate tax issue.

"But I'm trying to figure out what kind of a case this is, what cause of action we really have here. And looking through the statutes, I think it's probably a declaratory judgment action, one specifically brought under North Dakota Century Code 32–23–04, to determine the rights in a trust or estate.... [The Cooks] also seek a determination and a declaration that the estate is the owner of the cows in question that had a brand on them.

"The counterclaim, I think, is probably also similarly a declaratory judgment action to the extent that it seeks ownership of the same cows."

Following the bench trial, the court issued a memorandum decision in favor of the Cooks, requiring the Hansens to pay for 13 cows. It reached this amount by concluding that, as a matter of honor, and apparently in view of the amount of land involved, the Hansens would not have allowed Grace to own less than 30 cows in the lease agreement. Considering the fact that 15 cows were sold immediately following her death, two cows were sold at a public auction, and the proceeds from those sales were already in the Estate's possession, the Hansens still owed the Estate for 13 cows. The court said: "Any lesser number of cows would have rendered the rental provisions of the lease to be unconscionable and would have been an act of overreaching which Alfred Hansen would not have tolerated."

It is evident from the court's remarks above that it improperly characterized the Cooks' claim. The unresolved issue did not revolve around estate taxes or notions of equity. To the contrary, the most compelling issue to settle in this suit was the factual issue of the ownership of the double-branded cattle. In the complaint, the Cooks asserted ownership of 13 double-branded cows as property of the Estate of Grace Hansen. They prayed for return of the cows and the appropriate calf crops, or, in the alternative, damages valued "at the time of conversion." From the language and tone of the complaint, it is quite clear that the Cooks asserted ownership of certain cattle, that the cattle were converted by the Hansens, and that, for this conver-

sion, the Cooks sought damages. This action is clearly a conversion action.[3]

▇ Conversion occurs when one party wrongfully exercises "dominion over another's personal property," and that exercise is "inconsistent with, or in defiance of, the owner's rights." *Harley Miller Constr., Inc. v. Russell*, 481 N.W.2d 459, 463 (N.D. 1992). This is the type of wrongful conduct the Cooks assert occurred in this case.[4]

▇ Correctly characterizing the action does not end our inquiry. Next, we must decide if the Hansens are entitled to a jury trial in a conversion action. We hold that they are so entitled.

▇ At the outset, we think it significant that "[t]his State has been more liberal than most in construing the guarantee of jury trial," indicating "the high regard with which we view the right to a jury trial." *Gen. Elec. Credit Corp. v. Richman*, 338 N.W.2d 814, 818 (N.D.1983). We consider the right to a trial by a jury in actions at law to be "a basic and fundamental part of our system of jurisprudence." *Id.* at 817.

▇ The right to a jury trial is guaranteed by N.D. Const. art. I, § 13, which states: "The right of trial by jury shall be secured to all, and remain inviolate." It is well-established that the Constitution "preserves the right as it existed when the Constitution was adopted," and that it "preserves a trial by jury in all cases in which it was a right at common law." *Gen. Elec. Credit Corp. v. Richman*, 338 N.W.2d at 817. An action for possession of personal property or the recovery of money for that property is triable to a jury upon proper demand. *Zimmer v. Bellon*, 153 N.W.2d 757 (N.D.1967). Furthermore, this Court has held that the common-law action of conversion has not been displaced by provisions of the Uniform Commercial Code. *Great Am. Ins. Co. v. Am. State Bank*, 385 N.W.2d 460 (N.D.1986). Con-

---

3. Contrary to the District Court's conclusion, this case is not one properly brought as a declaratory judgment action under Section 32–23–04, N.D.C.C. A review of that statute reveals that an action for ownership of the cattle does not easily fit into any of the three provisions of that statute.

  "*Rights in trust or estate determined.*—Any person interested as or through a personal representative, trustee, guardian, conservator, or other fiduciary, creditor, devisee, heir, next of kin, or cestui que trust, in the administration of a trust, or of the estate of a decedent, an infant, a mentally ill or deficient person, or an insolvent, may have a declaration of rights or legal relations in respect thereto:

  "1. To ascertain any class of creditors, devisees, heirs, next of kin, or others;

  "2. To direct the personal representatives or trustees to do or abstain from doing any particular act in their fiduciary capacity; or

  "3. To determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings."

  If it should be argued that this action somehow fits under subsection 3, we think what we said in *General Elec. Credit Corp. v. Richman*, 338 N.W.2d 814 (N.D.1983), should guide us in this case. We said:

  "In view of the high regard with which we view the right to a jury trial, we hold that one against whom an action is brought may not be deprived of the right to a jury trial unless the party seeking to avoid a jury trial clearly and unambiguously shows that he [or she] is seeking an equitable remedy and that he [or she] is clearly entitled to it if he [or she] proves the facts as alleged in [the] complaint." *Id.* at 818.

  The action is more properly initiated under a different statute, providing damages for conversion.

  "*Damages for conversion of personalty.*—The detriment caused by the wrongful conversion of personal property is presumed to be:

  "1. The value of the property at the time of the conversion, with the interest from that time; or

  "2. When the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

  "3. A fair compensation for the time and money properly expended in pursuit of the property."

  Section 32–03–23, N.D.C.C.

4. Cattle are personal property, and are subject to ownership, and thereby, conversion. Property is classified in Section 47–01–02, N.D.C.C., as either "[r]eal or immovable" or "[p]ersonal or movable." Personal property is defined as including "every kind of property that is not real." Section 47–01–07, N.D.C.C. Embodied in the list of property subject to ownership are "domestic animals." Section 47–01–08, N.D.C.C. "Livestock," such as cattle, is defined as "[d]omestic animals used or raised on a farm." Black's Law Dictionary 935 (6th Ed.1990).

version is an action at law that was in existence before the Constitution was adopted. *Dairy Dept. v. Harvey Cheese, Inc.*, 278 N.W.2d 137 (N.D.1979). Thus, a jury trial is a right that exists in this conversion case.

We must therefore conclude that the court erred in not granting the Hansens a trial by a jury. It did not have discretion to strike a jury trial where one existed by the Constitution or by statute. *Daley v. Am. Family Mut. Ins. Co.*, 355 N.W.2d 812 (N.D.1984).[5]

In some minds, the issue of whether or not the right to a jury trial existed in this case may be somewhat clouded because the Cooks required the Hansens to account for calf crops from various years following Grace's death. However, we have previously stated that a "defendant in an action for damages cannot be deprived of a trial by jury because the plaintiff prays that defendant be required to account." *Gen. Elec. Credit Corp. v. Richman*, 338 N.W.2d at 818. Instead, the right to a jury trial should be "determined by the character of the issues as framed by the complaint ... or appearing on the face of the pleadings." *Id.* at 817. As discussed earlier, we find it clear from the face of the

pleadings and the language of the complaint that the Cooks asserted a wrongful exercise of dominion over cattle belonging to the Estate. It was a claim for conversion, an action at law.

There is one last point we find necessary to discuss in this opinion. In the memorandum decision, the court referred to the possibility of an unconscionable contract as being the impetus for reaching its decision. Under the circumstances, this reference and consideration was improper.

First of all, if the trial court were thinking of unconscionability in terms of the Uniform Commercial Code (U.C.C.) and Section 41–02–19, N.D.C.C., we question whether the U.C.C. provision addressing unconscionable contracts is applicable to this situation. The contract in question is a lease provision, exchanging the use of land for the care of cattle. There is an absence of "goods" being sold or exchanged by merchants. From the record, it appears to be more of a "services" contract, one not covered under the U.C.C. *See Northwestern Equipment, Inc. v. Cudmore*, 312 N.W.2d 347 (N.D.1981); *Air Heaters, Inc. v. Johnson Elec., Inc.*, 258 N.W.2d 649 (N.D.1977); *Peoples Bank and Trust v. Reiff*, 256 N.W.2d 336 (N.D.1977).[6] How-

---

5. In *Daley*, the defendant insurance company was denied a jury trial by the trial court because the claim against the insurance company involved less than $2,500. On appeal, we held that the trial court erred. In so doing, we said:

"Right to a trial by jury is governed by our constitution, statutes, and rules of procedure. Article I, Section 13 of the North Dakota Constitution provides: 'The right of trial by jury shall be secured to all, and remain inviolate.' We have held that this provision preserves the right of trial by jury as it existed at the time of the adoption of our State Constitution."

*Daley v. Am. Family Mut. Ins. Co.*, 355 N.W.2d 812, 814–15 (N.D.1984).

6. In *Air Heaters, Inc. v. Johnson Elec., Inc.*, 258 N.W.2d 649 (N.D.1977), we adopted the *Bonebrake* test used to determine the applicability of Article 2 of the Uniform Commercial Code to mixed contracts of "goods" and "services."

"The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with

labor incidentally involved (e.g., installation of a water heater in a bathroom)."

*Id.* at 652 (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974)).

In *Peoples Bank and Trust v. Reiff*, 256 N.W.2d 336 (N.D.1977), we found that provisions of the Uniform Commercial Code were applicable to a subordination agreement. We did not reach that decision by viewing the subordination agreement in a vacuum. Instead, there were several surrounding factors that significantly influenced our conclusion.

"However, since (1) the rider to the subordination agreement specifically referred to Article 9 of the U.C.C., (2) the agreement and rider are interwoven with transactions specifically covered by the U.C.C., *e.g.* sales of goods and security transactions, and (3) subordination by agreement is specifically contemplated by Section 41–09–37, N.D.C.C. (U.C.C. § 9–316), we hold that the provisions of Chapter 41–01, N.D.C.C. (Article 1 of the U.C.C.), are applicable in this case. We believe this to be the proper approach, whether under a theory of direct application or application by analogy."

*Id.* at 340. Thus, even though *Reiff* appears to expand the *Bonebrake* test adopted in *Air Heat-*

ever, we decline to indulge in further discussion on this point, as it is one more properly addressed by the parties and decided by the court on remand.

Although we agree with the Cooks that a determination of unconscionability, if applicable, is a question of law for the court, *Constr. Ass'n, Inc. v. Fargo Water Equip. Co.*, 446 N.W.2d 237 (N.D.1989), it is our view that the issue should have been considered, if appropriate, only after reasonable opportunity was afforded to present evidence, preferably at a separate hearing, with adequate notice. "Section 41–02–19(2) requires that the parties be afforded a reasonable opportunity to present evidence as to the contract's commercial setting, purpose, and effect to aid the court in making the determination of unconscionability." *Farmers Elevator & Mercantile Co. v. Farm Builders, Inc.*, 432 N.W.2d 864, 869 (N.D.1988).

For the foregoing reasons, we reverse all but that part of the judgment of the District Court for Dunn County to which the parties stipulated, and remand for further proceedings consistent with this opinion.

VANDE WALLE, C.J., concurs.

Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

Justice NEUMANN and Justice SAND-STROM, not being members of the Court when this case was heard, did not participate in this decision.

MESCHKE, Justice, concurring specially.

I concur fully in the reasoning for the reversal and remand for a jury trial on the plaintiffs' conversion claim.

I write separately to distance myself from the dicta about the unconscionability of the oral lease that exchanged the use of land for the care of cattle. That lease is not a legal issue in this lawsuit, and will not be in the jury trial for conversion of cattle.

The trial court's reference to "unconscionability" was simply a reasoning process about the credibility of the defendants' position. The trial court merely inferred that the defendants' testimony was unbelievable because their claimed oral terms were so unreasonable. The trial court was free to make that credibility inference without using the UCC law on unconscionability. On remand, the jury will be free, as well, to make a similar assessment of credibility without instruction on the legal doctrine of unconscionability.

LEVINE, J., concurs.

---

*ers,* from a review of the record provided on appeal, such an expansion does not seem to support the court's application of U.C.C. principles to the agreement at hand. Under the present facts, there is no indication of another contract falling under the U.C.C. with which the lease agreement was interwoven. This is an issue better investigated on remand.